UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AFZAL BEEMATH,

                        Petitioner,

v.

UNITED STATES OF AMERICA,

                        Respondent.

_____/

Civil Case Number 23-10016
Criminal Case Number 18-20713
Honorable David M. Lawson

## OPINION AND ORDER DENYING MOTION TO VACATE SENTENCE

Petitioner Afzal Beemath, formerly a licensed physician, pleaded guilty to conspiracy and unlawful distribution of controlled substances based on a superseding indictment accusing him of writing prescriptions for drugs without a valid medical purpose. He was sentenced to a below-guidelines prison term of 120 months. His convictions and sentence were affirmed on appeal. *United States v. Beemath*, No. 21-2750, 2022 WL 2279852 (6th Cir. Jun. 23, 2022). Beemath now has filed a motion to vacate his sentence and convictions, arguing that his attorneys did not provide representation consistent with the Constitution in a number of respects. The motion is fully briefed, and no hearing is necessary to determine that the claims lack merit. The motion will be denied.

I.

Petitioner Beemath was a licensed medical doctor specializing in pain management. Summarizing the case against him, the court of appeals on his direct appeal wrote:

> Beemath operated a palliative-care clinic in Lathrup Village, Michigan. His patients paid to obtain appointments; in exchange, Beemath prescribed them oxycodone, oxymorphone, and alprazolam — Schedule II and IV controlled substances — without a legitimate medical reason. Patients then filled the prescriptions and sold the drugs. Beemath worked with recruiters to find more patients; over five years, Beemath prescribed drugs with a total street value of some $22 million.

2022 WL 2279852, at *1.

On October 23, 2018, a grand jury returned an indictment charging Beemath with conspiracy to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (count 1) and unlawful distribution of controlled substances, in violation of 21 U.S.C. §841(a)(1) (counts 2 through 15). The grand jury returned a superseding indictment on April 18, 2019, adding an additional sixteen counts of unlawful distribution of controlled substances. Beemath is a citizen of South Africa and has substantial family ties there. Finding that he posed a substantial flight risk, the Court ordered Beemath detained pending trial.

Trial initially was scheduled for December 18, 2018. However, Beemath requested and received several adjournments to permit him additional time to review discovery materials. On September 3, 2019, during a hearing on the defendant's fifth such motion to adjourn the trial, defense counsel informed the Court that, despite repeated requests to the custodian at the federal detention center where Beemath was held, and requests to the assistant United States attorney for assistance, Beemath had not been given adequate access to trial preparation materials, most of which were in electronic format. The Court then set aside the defendant's detention order and granted the defendant's oral motion for bond, subject to restrictive conditions.

On September 30, 2019, the date set for the final pretrial conference, Beemath pleaded guilty to counts 1 through 7 and 18 through 30 of the superseding indictment. He admitted that he conspired with Joyce Robinson and Rhonda Nelson to prescribe controlled substances without a legitimate medical purpose, and he acknowledged that his coconspirators recruited patients to come to the clinic for the medications when they had no legitimate need for them. A runner named Lorenzo Williams also was part of the conspiracy; he pleaded guilty under a separate criminal information. Beemath also admitted writing the prescriptions connected to each of the substantive

counts to which he admitted guilt, acknowledging that each one was written without a legitimate medical purpose. At the hearing, the government agreed to move at sentencing to dismiss counts 8 through 17 and 31. The government stated its plea agreement on the record but did not put it in writing. At the change-of-plea hearing, defense counsel stated that he would be challenging the quantity of controlled substances for which the defendant would be accountable, apparently a point of contention throughout the pretrial proceedings. Plea Hr'g Tr. at 26, ECF No. 134, PageID.866.

The probation department's presentence report recommended a sentencing guideline range of 262 to 327 months based in part on a converted drug weight of 235,367 kilograms. Using its own calculations with the help of a physician consultant, the government proposed a drug quantity of 156,111 kilograms of converted drug weight. Defense counsel maintained that this figure was inappropriate because it likely included legitimate prescriptions. After hearing argument, the Court calculated a drug quantity of 20,067 kilograms, based solely on the prescriptions that the government's physician expert had found to lack a legitimate medical basis from a review of patient records. Separately, the government declined to seek a one-point adjustment for acceptance of responsibility because of Beemath's late decision to plead guilty. The Court therefore calculated a guideline range of 168 to 210 months' imprisonment but varied downward, sentencing Beemath to 120 months in prison. The Court observed that as a non-citizen, Beemath likely will be deported to South Africa upon his release from prison.

Beemath timely appealed. The Sixth Circuit rejected on the merits Beemath's arguments that (1) the district court violated Federal Rule of Criminal Procedure 32 when it calculated the drug quantity; (2) "the district court violated his right to due process," preventing him from adequately contesting the government's drug quantity evidence because of alleged lack of access to discovery materials; and (3) the government improperly withheld its one-point offense level

reduction for acceptance of responsibility.  *Beemath*, 2022 WL 2279852, at *1-2.  On January 4, 2023, Beemath filed his present motion to vacate his sentence under 28 U.S.C. § 2255.  The government filed a response, which included an affidavit from Beemath's attorneys, and Beemath filed a reply.

II.

Beemath argues that his attorneys performed deficiently because they did not learn about the nature of his medical practice, which led to their inability to answer the Court's questions at the sentencing hearing and their failure to submit documents that would have established the lawfulness of some of his prescriptions.  He also contends that his attorneys should have offered evidence of a 2014 investigation by the State of Michigan and Michigan Board of Medicine into Rhonda Nelson, one of his co-conspirators, in which he supposedly was cleared of wrongdoing.  Beemath asserts that his lawyers pressured him into pleading guilty; he speculates that they were not ready for the upcoming trial.  He also says that his lawyers should not have urged him to plead guilty when the plea colloquy of co-conspirator Lorenzo Williams would have exculpated him.  Next, he maintains that he was not given access to all the discovery materials in his case.  And finally, he says that his attorneys should have anticipated the holding in *Ruan v. United States*, 597 U.S. 450 (2022), in which the Supreme Court held "that [21 U.S.C.] § 841's 'knowingly or intentionally' *mens rea* applies to the 'except as authorized' clause" embedded in the criminal statute, which "means that in a § 841 prosecution in which a defendant meets his burden of production under § 885 [showing that he holds a valid DEA registration as a physician licensed to prescribe controlled substances], the Government must prove beyond a reasonable doubt that the defendant knowingly or intentionally acted in an unauthorized manner."  597 U.S. at 468.  He

believes that the holding in that case would have substantiated a good-faith defense, which his lawyers told him was not available to him.

It is well understood that a federal defendant challenging his sentence under section 2255 must show that the sentence "was imposed in violation of the Constitution or laws of the United States," the sentencing court lacked jurisdiction, the sentence exceeds the maximum penalty allowed by law, or it "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). And he "must allege either: '(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid.'" *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (quoting *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003)).

## A.

Some of Beemath's claims relating to his access to discovery materials and the calculation of drug quantity for sentencing guideline purposes could have been — and in some instances were — raise on direct appeal. A claim that could have been raised on direct appeal generally is not reviewable in a section 2255 motion. *Bousley v. United States*, 523 U.S. 614, 621 (1998) (holding that "even the voluntariness and intelligence of a guilty plea can be attacked on collateral review only if first challenged on direct review"); *Regalado v. United States*, 334 F.3d 520, 528 (6th Cir. 2003) (reaffirming that "[s]ection 2255 is not a substitute for a direct appeal, and thus a defendant cannot use it to circumvent the direct appeal process"). Moreover, when a defendant fails to raise an issue at trial or on direct appeal, that issue is generally forfeited. *See Huff v. United States*, 734 F.3d 600, 605-06 (6th Cir. 2013).

However, a claim that would otherwise be forfeited may be raised through a collateral attack under section 2255 if a defendant "can demonstrate cause and prejudice to excuse his

default." *Id.* at 606. "Ineffective assistance of counsel can constitute cause for a procedural default." *Ibid.* Furthermore, a claim that "cannot otherwise be reviewed for the first time on a § 2255 motion can be reviewed as part of a successful claim that counsel provided ineffective assistance." *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001). And a claim of ineffective assistance of counsel itself is properly raised in a section 2255 motion. *United States v. Graham*, 484 F.3d 413, 421-22 (6th Cir. 2007).

Beemath asserts such a claim here, contending that his trial attorneys' performances dipped below professional norms. To succeed on an ineffective assistance of counsel claim, the petitioner "must show both deficient performance by counsel and prejudice." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009). An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). One way of establishing deficient performance is to show that defense counsel missed a meritorious argument under the controlling law. However, the failure to file a meritless motion or raise a groundless objection does not constitute deficient performance. *Jalowiec v. Bradshaw*, 657 F.3d 293, 321-22 (stating that an "attorney is not required to raise a non-meritorious claim" (citing *Wilson v. Mitchell*, 498 F.3d 491, 514-15 (6th Cir. 2007))); *see also Knowles*, 556 U.S. at 123 (noting that the "[Supreme] Court has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success" to avoid a finding of deficient performance under *Strickland*).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors,

the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The *Strickland* framework applies to claims of ineffective assistance of counsel arising from a guilty-plea-based conviction. *Hill v. Lockhart*, 474 U.S. 52, 58 (1985).  The first component of the test remains the same.  *Ibid.*  However, the prejudice requirement focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. *Id.* at 59.  In other words, the petitioner must show "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Ibid.; see also Smith v. United States,* 348 F.3d 545, 551-52 (6th Cir. 2003).

In a federal habeas proceeding, when the Court weighs a claim of ineffective assistance, "[a]n evidentiary hearing is required unless the record conclusively shows that the petitioner is entitled to no relief" on her claim. *Martin v. United States*, 889 F.3d 827, 832 (6th Cir. 2018). "Where there is a factual dispute, the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims." *Ibid.*  There are some factual allegations in Beemath's motion that do not align precisely with his attorneys' affidavit.  But those factual disputes, such as they are, are not outcome determinative here, and a hearing is not required to address them.  Moreover, "[a] petitioner's mere assertion of his innocence, without more, does not entitle him to an evidentiary hearing." *Ibid.*

### A.  Ineffective Assistance of Counsel Claims

#### 1.  Failure to Investigate Practice/Submit Supplemental Memoranda

Beemath argues that his attorneys' performance during the proceedings was deficient because they failed adequately to learn the nature of his clinical practice.  He points to the record of his sentence hearing and alleges that his attorneys were unable to answer the Court's questions

effectively about his use of MRIs and a nurse practitioner.  He also alleges that his attorneys failed to submit certain documents to the Court as a supplemental sentencing memorandum that he believes would have established the lawfulness of his prescriptions.

Beemath misreads the sentencing hearing record and misinterprets the significance of the Court's questions.  Read in context, his attorney's answers do not suggest deficient performance. He points the Court to the following exchange during the argument on the appropriate guideline scoring:

> THE COURT: You need to be a little bit more discriminating in your argument, Mr. Chapman, because certainly he didn't order MRIs on every one of these patients.
>
> MR. CHAPMAN: That's true, your Honor.  Not every single patient received an MRI.
>
> THE COURT: And some of them, he didn't even sit with.
>
> MR. CHAPMAN: Some of them a nurse practitioner from the office sat with and treated as well.
>
> THE COURT: Right.  So when you argue categorically that he ordered MRIs, sat with, talked to these patients, I'm not sure that that's necessarily accurate if you're speaking globally.
>
> MR. CHAPMAN: Sure, your Honor.  And it's difficult in this case to go patient by patient.

Sent'g Hr'g Tr., ECF No. 188, PageID.1608-09.  Beemath argues that his attorney's acknowledgement that not every patient received an MRI was inaccurate because he only ordered MRIs where it was medically necessary.  He also maintains that his attorney's assertion regarding the nurse practitioner (NP) misses the point because he saw all patients "at some point" during their history with the clinic and an NP's decision to issue a prescription refill is within the standard of care.  However, Beemath's representations do not make defense counsel's statements

inaccurate.  He admits that he did not always order MRIs and that a nurse practitioner provided treatment.

More importantly, the thrust of Beemath's argument — that the exchange shows that his attorney was uninformed about his medical practice — is incorrect.  The quoted exchange occurred as the Court was attempting to ascertain how to calculate the drug weight for the guideline calculation.  It is evident that the Court's inquiries stemmed from a concern that defense counsel's arguments had become overly generalized.  *See* Sent'g Hr'g Tr., ECF No. 188, PageID.1609 ([The Court:] "[I]f the government is subject to criticism by being too categorical, I think you have to avoid that same approach.").  Asking about Beemath's specific practices was an attempt to test defense counsel's argument that the government had not met its burden of showing the illegitimacy of every prescription.  But Beemath's attorney did offer specific criticism of the government's evidence, contending that the government's expert inappropriately based his analysis on Beemath's failure to perform specific tasks.  *Id.* at PageID.1612.  Now arguing here that his practices were medically appropriate, Beemath attempts to make the same point.  The Court does not read his assertion here to suggest that *all* of his prescriptions were lawful, which would be at odds with the admissions he made at the guilty plea hearing.  But ultimately, the Court later tacitly accepted defense counsel's argument criticizing the government's over-generalizations, basing the drug weight calculation solely on the 24 patients whose files were reviewed by the government's expert physician — a reduction of nearly 90 percent from the government's calculation.  *Id.* at PageID.1616.  Beemath cannot establish ineffective assistance by cherry-picking statements from the record to suggest his attorneys failed to make an argument that they did in fact make.  Perhaps Beemath wishes that his attorneys provided more argument specific to the individual patients reviewed by the government expert, but he still does not point to any particularized evidence that

would undermine the expert's conclusion that these patients received prescriptions that were written without any legitimate medical purpose. After he was released on bond, Beemath had ample time to review patient records, review the government's expert report, and provide feedback to counsel. It is telling that even now he can offer no specific evidence about these patients to bolster his case. He has not established any deficient performance by his counsel on this ground.

In the same vein, Beemath argues that his attorneys failed to file a supplemental sentencing memorandum that contained several documents he believes could have been important to the Court's understanding of his case. He says that he instructed his attorneys to provide the Court information about an interview between them and Stacy Crocker, his medical assistant; a transcript of a disciplinary meeting between him and Lynette Guss, a nurse practitioner at his clinic; and a set of letters from patients that the government contended were beneficiaries of his unlawful prescriptions attesting to their medical needs. Beemath's attorneys maintain that they filed these documents, but they do not appear on the electronic docket.

Beemath's attorneys did submit supplemental filings to chambers. The Court recalls receiving a binder with some, if not all, of the documents enumerated above. The binder was presented as a courtesy copy, counsel did not ask the Court to docket it, and the Court did not "agree[] to accept it for filing." Fed. R. Crim. P. 49(b)(2)(B)(ii). And apparently, the attorneys did not add the exhibits to the docket. However, the submission provoked a motion by the government four days before the date originally set for sentencing "to strike defendant's additional sentencing exhibits marked as Exhibits A - R." ECF No. 153. The government represented that it had been served that day (March 6, 2020) with 395 pages of additional exhibits by defense counsel "without any context as to their significance." *Id.* at PageID.1366. The motion does not cite a docket number associated with the defense exhibits. Beemath's counsel filed a response to

the motion but similarly neglected to reference a docket number.  *See* ECF No. 155.   The Court

denied the government's motion but ordered the defendant to explain the significance of the

exhibits in a supplemental filing.  ECF No. 156.  The sentencing hearing was adjourned.  On March

19, 2020, the defendant filed a three-page memorandum explaining that the records were intended

"to rebut the Government's drug quantity calculation in order for the Court to make a fully

informed determination."  ECF No. 157, PageID.1378.   The document includes the following

explanations of the supplemental exhibits:

> **Exhibits A-D** are forged prescriptions obtained from subpoenas of pharmacies that filled prescriptions for patients listed in the Government's drug quantity calculation.  The defense will show at sentencing, evidence of a widespread prescription forgery scheme perpetrated against Dr. Beemath.  This evidence will rebut the Government's drug quantity calculation pursuant to U.S.S.G. 2D1.1

> **Exhibits E-N** are patient medical records for patients whose treatment was reviewed by Dr. Berland (the Government's expert).  The defense will show at sentencing that Dr. Berland did not review the entire patient medical record. Moreover, the medical records will show that even patients "recruited" by patient recruiters were chosen because of their significant medical ailments and painful conditions.

> **Exhibit O** is the affidavit of Stacey Crocker who worked as the primary front desk staff person for Dr. Beemath from 2012 through the date of his arrest.  Stacy Crocker's statement is important to rebut the Government's allegation that every patient who signed in and whose name appeared next to a recruiter was an illegitimate patient.  This rebuts the Government's argument that the names of recruiters next to patients on sign in sheets is evidence of unlawful prescribing.

> **Exhibit P** is a transcript of a compliance training with Stacy Crocker and Lynette Guss.  Dr. Beemath discussed compliance with both staff members.  He discussed appropriate charting, timely and complete patient history, prescription monitoring, MAPS reports reviews, medication checks, pill counts, and most importantly, appropriateness of prescribing controlled substances.

> **Exhibit Q** is the CV of Stacy Crocker which shows her qualifications and significant experience in the medical field.  Viewed in light of her affidavit, the Court can see that her belief about the practice is based on eleven (11) years of experience in the medical field and that she is a certified medical assistant.

> **Exhibit R** is a copy of Dr. Beemath's CV and additional accolades, not previously provided to the Court.

ECF No. 157, PageID.1378-80.  The filing did not include any of the referenced documents.

In their affidavit, Beemath's attorneys insist that the documents were filed.  Aff. ¶ 18, ECF No. 200, PageID.1747-48.  Plainly, they were not filed on the electronic docket.  They were submitted, however, and the Court considered them when calculating the sentencing guideline range.  A likely explanation is that the binder was returned to defense counsel following the proceedings, as is the Court's custom of charging the attorneys for the respective parties with the responsibility to marshal their own exhibits and docket those that they intend to include in the record for appeal.  *See* Fed. R. App. P. 10(a).  Defense counsel likely labored under the mistaken belief that they had docketed those exhibits, when they actually served them on the government and provided a courtesy copy to the Court (which was returned to them).  Those items were considered by the Court, however, when the drug quantity was calculated at an amount significantly lower than that advocated by the Probation Department and the government.

The same cannot be said for any supplemental sentencing memorandum.  The record of the sentencing hearing suggests that the Court was aware of defense counsel's original January 2020 memorandum but not any supplemental memoranda.  *See* Sent. Hr'g Tr., ECF No. 188, PageID.1637-38 ("THE COURT: Did you file a supplemental sentencing memorandum? MR. DICKSTEIN: No, your Honor. THE COURT: I didn't think so. This sentencing memorandum was filed January of 2020 . . . .").  However, the defendant's response to the government's motion to strike the supplemental exhibits (which was docketed as a "Sentencing Memorandum" (ECF No. 157)) succinctly summarized the arguments that those exhibits were meant to support.

Even if defense counsel failure to docket the exhibits could be considered deficient performance, Beemath is not entitled to relief on this claim because he also must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Ibid.* Beemath cannot satisfy that requirement.

Beemath contends that the interview record with his medical assistant, the transcript of Lynette Guss's disciplinary meeting, and letters from patients would have tipped the scales in his favor. But the proposition on which he thinks those items would help him would be "non-involvement with recruiters or any conspiracy" and "outline[] the thoroughness of the [patient] vetting process." ECF No. 192, PageID.1704. Given the weight the Court placed on the exhibits, additional arguments would not have made a difference to the sentence imposed.

Beemath argues that the patient letters would establish the legitimacy of the prescriptions for the patients included in the Court's ultimate drug weight calculation. During the sentencing hearing, the Court accepted the contention that not all of the prescriptions Dr. Beemath wrote were for illegal purposes when it calculated the drug quantity as 20,067 kilograms. As discussed earlier, that calculation was based on the 24 patient files that Dr. Berland reviewed. At least two of the letters in the record came from patients whose medical records he reviewed. Those letters do not discuss the appropriateness of Beemath's prescriptions but instead attest to his positive qualities. *See* Letter from Theotrice Chambers, Jr., ECF No. 149-2, PageID.997; Letter from Freddie Judkins, Sr., ECF No. 149-2, PageID.1004. The other patient letters did not alter the Court's conclusions, especially considering the defendant's admissions at the guilty plea hearing of his illegal prescribing activity.

Because these additional materials were before the Court when it calculated the drug quantity and the sentencing guideline range, Beemath cannot show prejudice resulting from his attorney's docketing fumble. If Beemath intends to argue that his attorney should have filed

-13-

additional patient letters, *see* Email from Attorney Robert J. Andretz, ECF No. 200, PageID.1758 (relaying Beemath's pre-sentencing concern about whether his counsel had contacted certain patients about submitting letters), it is unlikely that the Court, having discounted the weight of the letters it did receive, would have found additional letters persuasive.  If Beemath had evidence of patients who received appropriate treatment, he had ample time to submit it long ago based on his review of their medical records.

Another item Beemath cites is the affidavit of Stacy Crocker, which he believes "points to [his] non-involvement with recruiters or any conspiracy."  ECF No. 192, PageID.1704.  Defense counsel framed the significance of this affidavit somewhat differently in their explanatory memorandum, contending that the affidavit "rebuts the Government's argument that the names of recruiters next to patients on sign in sheets is evidence of unlawful prescribing."  ECF No. 157, PageID.1379.  Under either theory, however, the evidence would not have been material. Beemath's argument amounts to a claim that his attorneys should have introduced evidence of his innocence, a position that was untenable due to his guilty plea.  Plea Hr'g, ECF No. 134, PageID.852 ("THE COURT: Are you pleading guilty freely and voluntarily because, in fact, you are guilty and it is your own choice to plead guilty? THE DEFENDANT: Yes, Your Honor."). The Crocker affidavit also would have served no purpose under his attorneys' theory because the Court did not consider the individuals listed on the clinic sign-in sheets for purposes of calculating the drug weight.  *See* Sent'g Hr'g Tr., ECF No. 188, PageID.1616-17.  Therefore, any error by Beemath's attorneys by failing to emphasize these materials caused him no prejudice.

Finally, the transcript of Beemath's disciplinary meeting with nurse practitioner Lynette Guss is immaterial for similar reasons.  Beemath argues that it "provides a confirmation of my claims that no under-handed business was occurring or could be tolerated at the practice." Pet.,

-14-

ECF No. 192, PageID.1704.  Again, defense counsel's explanation of its potential utility was somewhat different, referring to it as "compliance training" to discuss how to prescribe controlled substances properly.  ECF No. 157, PageID.1379.  However, as mentioned above, these arguments advance claims of innocence, which contradicted the statements Beemath made during his guilty plea and potentially would have resulted in a higher guideline range because of their tendency to undermine his acceptance of responsibility.  His attorneys' failure to docket these documents caused Beemath no prejudice.

The arguments that defense counsel's performance was deficient are weak, and Beemath has not established prejudice on this record.  No evidentiary hearing is necessary to conclude that this claim does not warrant relief under section 2255.

### 2. Evidence regarding Rhonda Nelson

Beemath contends that his attorneys performed deficiently by ignoring information about the State of Michigan and Michigan Board of Medicine's 2014 investigation of Rhonda Nelson, whom he later named as a co-conspirator during his plea hearing.  He argues that if his attorneys had been diligent, they would have realized that he was cleared of wrongdoing in this investigation, which would have been powerful evidence that mitigated his culpability.  He also suggests that the Court's discussion of the prior investigation during sentencing creates a reasonable probability of a reduced sentence had the Court been aware that he was cleared in the investigation.

Beemath's attorneys submit that they were aware of this evidence and discussed it with him "at length," ultimately recommending that he plead guilty in light of the strength of the government's case.  Aff., ECF No. 200, PageID.1748.  The Court's assessment of that advice "must be highly deferential."  *Strickland*, 466 U.S. at 689.  Review of counsel's strategic choices is even more constricted.  *Morris v. Carpenter*, 802 F.3d 825, 843 (6th Cir. 2015) ("Courts should not second-guess counsel's strategic decisions, and should presume that counsel's conduct is

reasonable.") (citing *Strickland*, 466 U.S. at 689). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91.

Beemath avers that his lawyers only became aware of this information a week after the date of his sentencing. Reply, ECF No. 203, PageID.1826. The conflicting testimony creates a fact dispute about whether Beemath's counsel's choices were in fact strategic decisions. *See Workman v. Tate*, 957 F.2d 1339, 1345 (6th Cir. 1992) ("Where counsel fails to investigate and interview promising witnesses, and therefore 'has no reason to believe they would not be valuable in securing [defendant's] release,' counsel's inaction constitutes negligence, not trial strategy.") (quoting *United States ex rel. Cosey v. Wolff*, 727 F.2d 656, 658 n.3 (7th Cir. 1984)). No evidentiary hearing is necessary, though, because the record established during sentencing makes clear that Beemath suffered no resulting prejudice.

During the sentencing hearing, the Court stated:

Also, the Court has to, in providing a just punishment for the offense, account for the protection of the public. And although I would like to say that it's unlikely that Dr. Beemath would engage in similar conduct, I'm not entirely convinced that that's the case for a couple of reasons.

Certainly, he won't be prescribing medication because he won't have the legal ability to do that. On the other hand, he had two prior occasions in which his prescribing practices were called into question. He was not charged with any crimes. He was called before a discipline board and his practices were questioned.

Perhaps if something more harsh occurred to him at the time, he would not have found himself in this situation, but he does find himself in this situation, and it was — and it's not because it's the first time that his prescribing practices have run up against a measure of good medical practice or safe medical practice.

-16-

Sent'g Hr'g, ECF No. 188, PageID.1649.  The Court's reference to "two prior occasions" was derived from the government's sentencing memorandum, which indicated that in 2010, the Michigan Board of Professional Licensing (LARA) placed Beemath on probation for irregularities in his opioid prescribing practices, and that he was later "confronted by LARA in 2013 and in 2017."  ECF No. 151, PageID.1092.

Again, to establish that he was prejudiced by any error by his counsel, Beemath must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  Certainly, in the sentencing context, "any amount of actual jail time has Sixth Amendment significance." *Glover v. United States*, 531 U.S. 198, 203 (2001).  Thus, even a single day of additional time in prison is presumably significant enough to demonstrate prejudice.  *Ibid.*  But here, there is no chance that Beemath's sentence, which already represented a substantial variance below the guideline range of 168 to 210 months, would have been shorter had his counsel informed the Court that he had been cleared of wrongdoing in a "2014" investigation.

Beemath provides no facts about the nature of the 2014 investigation to support his assertion that he was in fact cleared of wrongdoing as he claims.  The record only reflects investigations that occurred in 2013 and 2017.  In any event, further information of the type he suggests the Court should have considered would have made no difference.  As noted above, the Court was aware that Beemath previously had been investigated by Michigan officials in 2010, 2013, and 2017.  His reference to a 2014 investigation likely corresponds with the 2013 investigation mentioned in the government's sentencing memorandum, but nothing in the memorandum suggests that Beemath was found to have committed wrongdoing in 2013.  Rather, the government simply informed the Court that Beemath "was . . . confronted by LARA in 2013

-17-

and in 2017 . . . ."  Gov't Sent'g Memorandum, ECF No. 151, PageID.1092.  The government surely would have indicated whether Beemath was charged and disciplined as a result of these investigations if he had been.  The Court's reasoning did not turn on its belief that Beemath was formally found responsible in 2013.  The point of referring to these incidents — that they should have prompted Beemath to exercise greater caution — would stand unaltered by any information that he ultimately was cleared of wrongdoing in 2014.  Obviously, he pleaded guilty to drug-distribution crimes covering the period that included 2014.  *See* Superseding Indictment, ECF No. 45, PageID.348 ("Beginning in or about January 2013 . . . .").  Moreover, LARA *did* find irregularities with Beemath's prescribing practices in 2010, *ibid.*, a fact that Beemath does not dispute.

Beemath's argument that his attorneys were deficient by failing to investigate this information as it connects to his decision to plead guilty also fails because it is plain that the evidence would not have helped him.  Rather, it would have supplied a powerful indication of his *mens rea*, showing that he was aware that he was associated with unsavory characters yet persisted in the same prescribing practices until at least 2017.  Beemath cannot establish that he was in any way prejudiced by any failure on the part of his attorneys to investigate or inform the Court about the outcome of a 2014 state investigation.

### 3. Pressure to Accept Plea

Beemath next argues that his counsel "bullied" him into pleading guilty.  Pet., ECF No. 192, PageID.1707.  He states that on the day he arrived at Court for the final pretrial conference, his lawyers began urging him to plead guilty.  *Ibid.*  He was surprised because four days earlier his counsel had requested more time to review discovery.  *Ibid.*  He asked his attorneys for an opportunity to consult his family about the plea but was told it was a "now-or-never" situation and that they were equipped to help him secure a favorable sentence if he pleaded guilty.  He says that

he now questions whether his attorneys were prepared to proceed to trial and whether this might have influenced them to encourage a guilty plea. *Ibid.*

Beemath's attorneys dispute that version of the events. They aver in their affidavit that they engaged in "lengthy" discussions with Beemath about plea deals during their representation and state that on the day of the hearing they answered all of his questions. However, in his reply, Beemath asserts that counsel denied him an opportunity to consult with family members and that he only had fifteen minutes to discuss the plea with counsel. Reply, ECF No. 203, PageID.1823. He adds that he "had to be tutored" by counsel on how to accept the plea and that he objected to naming his conspirators but was told it was a condition of the plea. *Ibid.*

Beemath faces several obstacles with this argument. A defendant is entitled to the effective assistance of counsel during plea negotiations. *Lafler v. Cooper*, 566 U.S. 156, 162 (2012). In addition, a guilty plea must be voluntary and intelligently tendered. *See* Fed. R. Crim. P. 11(b)(2). But that assessment must be "determined under the totality of the circumstances." *United States v. Ormsby*, 252 F.3d 844, 849 (6th Cir. 2001) (citing *Brady v. United States*, 397 U.S. 742, 749 (1970)). And the Supreme Court has warned that a guilty plea should not be "upset . . . solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies." *Lee v. United States*, 582 U.S. 357, 369 (2017). A transcript that suggests that a guilty plea was made voluntarily and knowingly creates a "heavy burden" for a petitioner seeking to overturn his plea. *Garcia v. Johnson*, 991 F.2d 324, 326-28 (6th Cir. 1993).

Here, the record dashes any contention Beemath might have that his guilty plea was involuntary. During the plea hearing, the Court engaged in the following colloquy with him:

> THE COURT: Now, you have both of your attorneys with you in court today. Did you all receive a copy of the first superseding indictment that I just mentioned?
>
> THE DEFENDANT: Yes, Your Honor.

-19-

THE COURT: Did you read it?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Did your attorneys explain to you the elements of the crimes, that is, what the government must prove to convict you?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And I understand that you've been very diligent in reviewing the evidence that the government would be presenting at trial. You've done that with your attorneys, have you not?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And did your attorneys explain — excuse me.

(Short pause.)

THE COURT: Did your attorneys explain how that evidence would satisfy those elements or prove those crimes if you chose to go to trial?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Have you had a chance to consider your options, that is, the relative advantages and disadvantages of pleading guilty versus going to trial?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And have you, as you just told me before, decided it is in your best interest to plead guilty and give up your right to trial?

THE DEFENDANT: Yes, Your Honor.

. . .

THE COURT: All right. Now, have you had a chance to discuss your options and this plea agreement such as it is with your attorneys to your satisfaction?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Has anyone made any other or different promise or assurance to you of any kind in an effort to persuade you to plead guilty?

THE DEFENDANT: No, Your Honor.

THE COURT: Have you been promised by me, that is, the Court, or by the attorneys for the government or your own attorneys that you would be put on probation or given any other specific sentence in exchange for pleading guilty?

THE DEFENDANT: No, Your Honor.

THE COURT: Has anyone told you that I would go easier on you or give you a shorter sentence if you decided to give up your right to trial and plead guilty instead?

THE DEFENDANT: No, Your Honor.

THE COURT: Has anyone tried to force you to plead guilty by any threats or pressure or any mistreatment of any kind?

THE DEFENDANT: No, Your Honor.

THE COURT: Are you pleading guilty freely and voluntarily because, in fact, you are guilty and it is your own choice to plead guilty?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand that you have the right to plead not guilty to all of the charges that have been filed against you?

THE DEFENDANT: Yes, Your Honor

Plea Hr'g Tr., ECF No. 134, PageID.849-52.

The Court then reviewed, in detail, the constitutional rights Beemath was foregoing by pleading guilty, *id.* at PageID.853-54, as well as the possible penalties and collateral consequences for each of the charges, *id.* at PageID.854-56.  Notably, during his plea hearing he expressly disavowed that any promises, other than those stated on the record, had been made to him, and stated that he had not been subject to "any threats or pressure or any mistreatment" to force him to plead guilty.  *Id.* at PageID.852.  Beemath is "bound to the answers he provide[d] during [the] plea colloquy." *Ramos v. Rogers*, 170 F.3d 560, 566 (6th Cir. 1999).

A hearing is not necessary to resolve Beemath's allegations about his attorney's conduct. He points to no facts in the interaction with his attorneys that imply any threats or coercive conduct. At best, his description resembles an attorney providing frank advice to a client who was facing a formidable government case against him — advice he could have rejected if he chose.  Moreover, Beemath, who was licensed to practice medicine, is a sophisticated person who could competently

-21-

understand his rights and options. *See* Plea Hr'g Tr., ECF No. 134, PageID.848-49. The record simply does not support his argument that his plea was involuntary because of the ineffective assistance of counsel.

It also bears repeating that to succeed on this claim, Beemath "must point to evidence showing a 'reasonable probability' that, but for his counsel's error, he wouldn't have pled guilty and instead would have gone to trial." *United States v. Singh*, 95 F.4th 1028, 1033 (6th Cir. 2024). "This test has several components. [First, the petitioner] must demonstrate that going to trial 'would have been rational' under the circumstances of his case. That inquiry is objective, not subjective. Next, [he] must point to evidence contemporaneous with his plea showing it's reasonably likely he would have taken that route. Only in 'unusual circumstances' will a defendant who conceded guilt at the plea stage be able to meet this 'high bar.'" *Id.* at 1033-34 (citing *Lee v. United States*, 582 U.S. 357, 369-70 (2017); *Kimbrough v. United States*, 71 F.4th 468, 473 (6th Cir. 2023); *Pilla v. United States*, 668 F.3d 368, 373 (6th Cir. 2012)).

Beemath has not identified any evidence that comes close to satisfying any of these factors. The government's case against him was strong, which he presumably realized after his extensive review of the discovery materials. The decision to plead guilty in the face of that evidence hardly could be considered irrational. He has not indicated that he wanted to go to trial to confront that evidence.

The petitioner is not entitled to relief on this claim.

### 4. Inability to Access Patient Charts

Beemath argues again that he was denied adequate access to his patient charts as part of the discovery material, although he acknowledges that he is not certain whether the fault lies with the government or his own attorneys. Beemath's access to discovery while in pretrial detention was litigated extensively before his guilty plea, and his inability to review materials adequately in

-22-

the detention facility ultimately led the Court to approve his release on bond.  He raised this same issue on appeal, and it was rejected by the Sixth Circuit, albeit not in the context of an ineffective assistance of counsel claim.  *Beemath*, 2022 WL 2279852, at *2.

Beemath elaborates on his argument here, contending that the government failed to provide him access to a Microsoft Excel file containing his patients' medical records, which the government's expert witness used to formulate opinions on his prescribing practices.  That argument is a non-starter, however.  The government's Excel file was assembled from Beemath's own office records, which he kept on a proprietary web-based electronic medical record system called Practice Fusion.  The government seized that data with a search warrant and used it to populate its spreadsheet.  Beemath admits that he had access to his patient charts through his Practice Fusion account.  Reply, ECF No. 203, PageID.1821-22.  His attorneys confirm that he did have access to the patient charts and had reviewed them.  Aff., ECF No. 200, PageID.1749.  And in a pre-trial motion requesting a continuance of the trial, his attorney represented that Beemath had spent more than a week reviewing patient files in his Practice Fusion account after he was released on bond.  ECF No. 105, PageID.703.

Beemath simply had no need to review patient files in an Excel format when he had access to the same records in Practice Fusion.  He cites no authority for the proposition that the government had an obligation to furnish him a copy of the Excel version of the medical records it utilized.  In fact, it appears that the government did provide Beemath's lawyer access to the Excel sheet, but he complained that it was "unworkable."  Hr'g on Mot. to Continue, ECF No. 89, PageID.604.  Nothing about that preference for the native files suggests deficient performance.  Beemath has not presented any evidence particular to the patient charts reviewed by Dr. Berland that undermines his conclusions about his prescribing practices.  And, as the court of appeals

observed, "at sentencing Beemath did not ask for more time to prepare. . . .   His due-process challenge is meritless." *Beemath*, 2022 WL 2279852, at *2.   The same must be said of his ineffective assistance of counsel claim based on this ground.

5. Evidence from Codefendant's Plea Hearing

Beemath's last argument that his attorneys performed deficiently is based on his belief that his lawyers erred by overlooking codefendant Lorenzo Williams's statement during his plea hearing that "Dr. Beemath had no part in this conspiracy."   ECF No. 192, PageID.1711.   He maintains that this was powerful exculpatory evidence that should have been considered by both his attorney and the Court.   Beemath's paraphrase of Williams's statement at his plea hearing, however, is inaccurate.   When Williams pleaded guilty on August 13, 2019 to conspiracy to possess with intent to distribute controlled substances, he described his involvement in the crime as follows:

> THE COURT: Now, did you agree with the doctor to have him write prescriptions so you could get these pills so that you could sell them?
>
> THE DEFENDANT: No, I never agreed to the doctor.   It's just, I got it and turned in on my paperwork, and he just prescribed me medication for my pain.
>
> THE COURT: Whether you needed it or not?
>
> THE DEFENDANT: Yes.
>
> THE COURT: All right.   The crime is a conspiracy crime and it calls for two or more people to enter into an agreement.   Who did you enter into an agreement with?
>
> THE DEFENDANT: Somebody who I --
>
> THE COURT: I'm sorry?
>
> (Discussion held off the record at 11:59 a.m.)
>
> MR. SHANKER: You want the name, your Honor, of the individual?
>
> THE COURT: Well, I asked him about the doctor. He said it wasn't the doctor.

-24-

THE DEFENDANT: No, it was somebody else who was — brought me to the doctor, let me know about the conspiracy, about selling oxycodone, oxymorphone.

THE COURT: Oh, all right.  And who was that?

MS. McCULLOUGH: Your Honor, it's — he has a familial relationship with the person.  Would the Court be satisfied if he merely gave the initials?

THE COURT: Well, tell me what the relationship is.

MS. McCULLOUGH: It's his mother.

THE COURT: All right.

THE DEFENDANT: Yes.

THE COURT: Did your mother work for the doctor?

THE DEFENDANT: No.  She never worked for him.

THE COURT: Did she have some sort of association with him?

THE DEFENDANT: Yes, she has.

Plea Hr'g of Lorenzo Williams, ECF No. 97, PageID.655-56.

Williams's statements do not in any way exonerate Beemath.  True, Williams stated that he did not conspire with Beemath himself; he indicated that he conspired with his own mother.  But Williams's mother is Joyce Robinson — an individual Beemath admitted to conspiring with during his plea hearing.  ECF No. 192, PageID.1711.  Williams also confirmed that Robinson was associated with Beemath.  The statement by Williams at his guilty plea hearing would not have helped Beemath's case.  Even if Beemath could prove that his attorneys somehow overlooked it, a contention for which he has provided no support, he cannot show that his attorneys' failure to consider or call the Court's attention to *inculpatory* evidence prejudiced him in any way.

## B. *Ruan v. United States*

Last, Beemath argues that his conspiracy and substantive convictions for distributing controlled substances are defective under the holding of *Ruan v. United States*, 597 U.S. 450

(2022), which was decided after he was sentenced.  He argues that his counsel was ineffective by failing to advise him of the government's burden under *Ruan* of demonstrating that he knew his conduct was unauthorized.  He also says that he attempted to pursue a good faith defense but was told by his attorneys that "such a defense did not exist and would not stand the muster of any jury instruction."  ECF No. 192, PageID.1713.  He also maintains that the factual basis for his guilty plea is inadequate under *Ruan*.

Beemath's convictions are based on violations of 21 U.S.C. § 841(a), which makes it a federal crime, "*[e]xcept as authorized*[,] . . . for any person knowingly or intentionally . . . to manufacture, distribute, or dispense . . . a controlled substance."  21 U.S.C. § 841(a) (emphasis added).  In *Ruan*, the Supreme Court confronted a narrow question about the elements the government must prove to convict a licensed physician for "unauthorized" distribution of controlled substances.  *See* 597 U.S. at 454-55 ("The question we face concerns § 841's exception from the general prohibition on dispensing controlled substances contained in the phrase '[e]xcept as authorized.'  In particular, the question concerns the defendant's state of mind.").  The Court held that "once a defendant meets the burden of producing evidence that his or her conduct was 'authorized,' the Government must prove beyond a reasonable doubt that the defendant knowingly or intentionally acted in an unauthorized manner."  *Id.* at 457.

Beemath contends that his attorneys performed deficiently because they failed to advise him of the government's burden under *Ruan*.  Beemath fails to appreciate, however that *Ruan* was decided after he was sentenced and his appeal was decided, so to argue his attorneys were ineffective, he must be able to show that they should have predicted what *Ruan* would hold and advised him under that standard.  But constitutionally adequate representation does not require an attorney to be "clairvoyant."  *Moore v. Mitchell*, 708 F.3d 760, 793 (6th Cir. 2013); *Kimbrough v.*

*United States*, 71 F.4th 468, 472 (6th Cir. 2023) ("[T]he Sixth Amendment guarantees a competent attorney, not a clairvoyant one."). The Sixth Circuit has stated explicitly that "counsel is not ineffective for failing to predict the development of the law" unless the issue is "'clearly foreshadowed by existing decisions.'" *Thompson v. Warden, Belmont Corr. Inst.*, 598 F.3d 281, 288 (6th Cir. 2010) (quoting *Lucas v. O'Dea*, 179 F.3d 412, 420 (6th Cir. 1999)).

Beemath's lawyers cannot be faulted for failing to predict *Ruan* and advise him of what it would hold. Although plausible arguments had been made over the meaning of the statute's "except as authorized" clause, *see Dimkpa v. United States*, No. 19-443, 2023 WL 2349599, at *4 (M.D.N.C. Mar. 3, 2023) (explaining how such arguments were reasonably available), the Supreme Court's ultimate decision was not so "clearly foreshadowed" as to render their representation deficient. *Thompson*, 598 F.3d at 288. Even the permissibility of objective language in a good faith jury instruction was murky territory within the Sixth Circuit at the time. *See United States v. Volkman*, 797 F.3d 377, 387-88 (6th Cir. 2015) (approving a jury charge that included a good faith instruction in a prosecution under 21 U.S.C. § 841(a)); *but see United States v. Godofsky*, 943 F.3d 1011, 1026 (6th Cir. 2019) ("[W]hen these cases, or cases like them, use the term "good faith," they do not mean *subjective* good faith. Rather, this is more or less *objective* good faith . . . ."). Beemath's attorneys did not perform deficiently by failing to advise him of what *Ruan* would later hold.

Beemath's challenge to the factual basis of his plea fails because his own admissions at the guilty plea hearing foreclose the argument. At that hearing, the Court informed Beemath that the government was required to prove a conspiracy in which he "distributed a controlled substance, that [he] knowingly caused or aided and abetted others in distributing that substance to other people and that in this case [he] did so outside of the scope of [his] professional practice and for no

legitimate medical purpose."  Plea Hr'g, ECF No. 134, PageID.857.  Beemath then recited the

following facts:

> THE COURT: All right.  Tell me in your own words what you did that makes you believe you were guilty of that offense.
>
> THE DEFENDANT:  I plead guilty to having an agreement with Joyce Robinson and Rhonda Nelson to prescribe controlled substance for illegitimate medical purposes.
>
> THE COURT: All right.  Did you have a pain clinic?
>
> THE DEFENDANT: Yes, Your Honor, a palliative clinic.
>
> THE COURT: And you treated people with intractable pain; is that correct?
>
> THE DEFENDANT: That's correct, Your Honor.
>
> THE COURT: But you also had those two individuals and maybe others recruit patients to come to the clinic who really did not have a legitimate need for the medication.  Is that fair to say?
>
> THE DEFENDANT: Yes, Your Honor.
>
> THE COURT: All right. And when you — and when they came in, did you write prescriptions for them so they could obtain the controlled substances that we mentioned?
>
> THE DEFENDANT: Yes, Your Honor.
>
> THE COURT: All right.  And did you believe at the time that they had — that there was no medical purpose, proper legitimate medical purpose for those prescriptions that you wrote?
>
> THE DEFENDANT: Yes, Your Honor.

*Id.* at PageID.858-59.

Beemath's admission that he contemporaneously believed that he wrote his prescriptions without a legitimate medical purpose satisfies the government's burden under *Ruan* of showing that he knew or intended that his conduct was unauthorized.  For defendants who have proceeded to trial, the Sixth Circuit has found no error under *Ruan* where the jury was instructed that a defendant's knowledge could be established by deliberate ignorance, such as if the defendant

"deliberately ignored a high probability that the controlled substance . . . was distributed or dispensed without a legitimate medical purpose in the usual course of professional practice . . . ." *United States v. Anderson*, 67 F.4th 755, 766 (6th Cir. 2023). Beemath's admissions during his plea hearing amply provided a sound factual basis for his plea.

Beemath also asserts that his attorneys were ineffective by giving him bad advice about a good faith defense. He alleges that when he attempted to raise with his attorneys the possibility of employing that defense, he was "shut down" and told that "such a defense did not exist and would not stand the muster of any jury instruction." ECF No. 192, PageID.1714. Because he challenges the influence of his attorneys' advice on his decision to plead guilty, he must demonstrate a "reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. "[W]hen the defendant's decision about going to trial turns on his prospects of success and those are affected by the attorney's error," the defendant also must show "that he would have been better off going to trial." *Lee v. United States*, 582 U.S. 357, 365 (2017).

Beemath's argument that his attorneys incorrectly advised him about a good faith defense draws heavily on Justice Alito's concurrence in *Ruan*. Justice Alito argued that the appropriate interpretation of the statute is that a doctor who acts in "subjective good faith" has an affirmative defense under the statute. *Ruan*, 597 U.S. at 479 (Alito, J., concurring in the judgment). That opinion did not command a majority of the Court. Instead, the Court held that the government must prove that the defendant knew his conduct was unauthorized. The Sixth Circuit therefore has characterized a "good faith" defense as likely "obsolete" after *Ruan*. *United States v. Bauer*, 82 F.4th 522, 532 (6th Cir. 2023). However, at the time of Beemath's plea, Sixth Circuit precedent likely should have alerted Beemath's attorneys that good faith might have been a viable defense

to prosecutions under section 841(a).  *Volkman*, 797 F.3d at 387-88.   The Sixth Circuit has recognized post-*Ruan* that a proper good faith instruction "performs the same function as the 'knowledge or intent' requirement identified by the Supreme Court" in *Ruan*.  *Anderson*, 67 F.4th at 765.   It appears that good faith was a viable defense when Beemath pleaded guilty, and a substantially similar defense theory remains available in the form framed by the *Ruan* majority. Therefore, if Beemath's attorneys told him that good faith was no defense to the charged crimes, they performed deficiently by misinforming him of the governing law.

But Beemath also must demonstrate that "reject[ing] the plea bargain would have been rational under the circumstances."  *Pilla v. United States*, 668 F.3d 368, 373 (6th Cir. 2012) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010)).   The government's case against him was strong.   And although he maintains that his patient records establish the lawfulness of his prescribing practices, he has not tendered any evidence to support that argument.  To the contrary, the evidence the government presented at the sentencing hearing, bolstered by the opinion testimony of its physician expert, easily establishes that the government's case against him was so strong that it would have been irrational for him to proceed to trial.

The petitioner is not entitled to relief on this claim.

### III.

The petitioner's claims of ineffective assistance of counsel and his arguments based on *Ruan v. United States* are without merit, and no hearing is required for that determination.

Accordingly, it is **ORDERED** that the petitioner's motion to vacate his sentence (ECF No. 192) is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   November 19, 2024